*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-5878

JOSEPH SWAFFORD,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 04-00138—Curtis Lynn Collier, Chief District Judge.

Argued: December 7, 2007

Decided and Filed: January 17, 2008

Before: MERRITT, COLE, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Paul D. Cross, CLEMENTS & CROSS, Monteagle, Tennessee, for Appellant. Gregg L. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Paul D. Cross, CLEMENTS & CROSS, Monteagle, Tennessee, for Appellant. Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

## I.

MERRITT, Circuit Judge. The defendant, Joseph Swafford, challenges his conviction for selling iodine used in the production of methamphetamine, a controlled substance. We agree with the defendant that his conviction on the two conspiracy counts suffers from an impermissible variance because in each charge there were multiple conspiracies with different participants, and therefore the conspiracy convictions must be overturned. Additionally, we find that the district court erred by denying the defendant's amended motion to strike or elect the substantive counts. The 38 substantive counts must therefore be merged into 19 counts. Accordingly, we reverse the district court opinion in part and remand with instructions to resentence the defendant in accordance with this opinion.

1

**II.**

On February 24, 2005, a federal grand jury returned a forty-count superceding indictment charging Swafford with crimes related to the sale of iodine, a necessary ingredient in the production of methamphetamine. Count 1 charged that from August 1, 2001, to October 15, 2004, the defendant and co-defendant corporation, JES, Inc. – operating as Broadway Home and Garden ("Broadway") – conspired to aid and abet the manufacture of 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. Count 2 charged that for the same dates the defendants conspired to distribute iodine, having reasonable cause to believe that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 846 and 841(c). Counts 3 through 21 charged that on various dates the defendants possessed chemicals knowing and having reasonable cause to believe that they would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6). Finally, counts 22 through 40 charged that on various specific dates, the defendants unlawfully distributed iodine, knowing and having reasonable cause to believe that the iodine would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2).

At trial, the government offered considerable testimony from approximately 20 former Broadway customers and admitted methamphetamine "cooks," each of whom testified that Swafford had sold them iodine, many on a regular basis, over a number of years. The government attempted to prove that such quantities clearly exceeded that necessary for a legal purpose (*e.g.* the treatment of horses), thus precluding a potentially legitimate buyer-seller relationship. The government also offered testimony tending to show that the defendant was aware that the iodine was destined for methamphetamine production, including the following facts: the defendant only accepted cash for the sales of iodine (but would allow credit cards for other sales), used trade language associated with methamphetamine production, warned his iodine customers when federal agents were in the store, advised his clients about different types of iodine available and enquired about the resulting product. A jury found Swafford guilty on all forty counts and the judge sentenced Swafford to 360 months, the minimum recommended Guidelines sentence.[1] Swafford filed a timely appeal and raises a total of eight challenges to his conviction.

**III.**

The defendant argues that the district court erred in granting the government's motion to disqualify his retained counsel. This Court's standard of review of a district court's decision regarding the disqualification of counsel is a "generous one." *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995). "The district court is to be given wide latitude" in making such determinations and a decision will be upheld unless "arbitrary" or "without adequate reasons." *Id.*

The Sixth Amendment guarantees counsel for all defendants in criminal prosecutions and recognizes a qualified right to choose that counsel. *Wheat v. United States*, 486 U.S. 153, 158-59 (1988). A defendant enjoys a presumption in favor of counsel of choice, but such a presumption may be overcome because such a choice must be balanced with the "the court's interest in the integrity of the proceedings and the public's interest in the proper administration of justice." *Mays*, 69 F.3d at 121; *see also Wheat*, 486 U.S. at 164. In situations where a potential conflict of interest

---

[1]The sentence corresponded with a criminal history category I (no criminal history) and a baseline sentencing level of 38, plus two enhancements: a 2-point enhancement for obstruction of justice and a 2-point enhancement for his role in the offense. The attendant sentencing guidelines range was 360 months to life. The baseline level of 38 resulted from the court's calculation that the total amount of iodine sold by the defendant for use in the manufacture of methamphetamine resulted in the production of 424 kilograms of the drug. We leave it to the district court in the first instance to determine upon remand whether it is appropriate to aggregate the underlying drug production without the conspiracy charges and what the appropriate Guidelines range is for the defendant.

may arise, the court's interest in the integrity of the proceedings may trump the defendant's choice. Whether the client waives his right to conflict-free representation is not dispositive, as district courts have the ability to prevent a conflict "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163.

The defendant claims that the district court erred in granting the motion to disqualify counsel because he had waived his right to an "advice of counsel" defense. Originally, the defendant intended to offer the partial defense of "advice of counsel," which disproves the *mens rea* element of the offense, by showing that he had spoken with a lawyer from the same firm representing him at trial about the legality of his iodine sales. In describing the potential for this defense to result in a conflict of interest, the district judge noted that the firm had refused to allow the defendant to call the lawyer who allegedly provided the advice, that the government intended to call an attorney from the firm if Swafford testified as to his conversation, and that defense counsel's potential loyalty to the firm might prevent him from adequately cross-examining a fellow partner. *See United States v. Swafford*, 2005 U.S. Dist. LEXIS 26890, *26 (D. Tenn. 2005) (mem.) (citing Tenn. S.Ct. R. 8, RPC 1.7(b)(2005)). The judge acknowledged that Swafford was prepared to waive this defense and that his counsel did not believe that their representation would be adversely affected. *Id.* at *10-11. Nevertheless, he granted the motion on the grounds that during the course of the trial, the government might offer evidence leading the defendant to testify, which, in turn, might implicate the conflict of interest within the firm. This potential, the court concluded, required resolution of the issue before the trial because "the stakes are so high" (*e.g.* mistrial, replacing counsel). *Id*. at *27.

The district court appropriately recognized its obligation to balance the defendant's right to counsel of choice with the court's independent obligation to serve justice. The district court quoted the following language from *Wheat*, which is instructive as well for the reviewing court:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

*Swafford*, 2005 U.S. Dist. LEXIS 26890 at *23-24 (quoting *Wheat*, 486 U.S. at 162-163). Such discretion is warranted, moreover, because of the "whipsaw" nature of waiver of conflict-free representation: "If a trial court disqualifies counsel, defendant will argue . . . a violation of his Sixth Amendment right to counsel of his choice. If a trial court refuses to disqualify an attorney, a defendant may later attempt to raise an ineffective assistance of counsel claim based on conflict of interest, asserting that his waiver was not knowingly or voluntarily made." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1353-1354 (6th Cir. 1993) (citing *Wheat*, 486 U.S. at 161-62). We are aware that such an argument – taken to its logical extreme – could allow a district court judge to disqualify counsel every time the government files a motion, but believe that the district court

appropriately found that this was not the case. *See Swafford*, 2005 U.S. Dist. LEXIS 26890 at *24-25 (discussing that the possibility for the government to "manufacture" conflicts).[2]

We have previously affirmed the disqualification of counsel in a case involving a potential advice-of-counsel defense. *See United States v. Timmer*, 1995 U.S. App. LEXIS 37057 (6th Cir. 1995). In *Timmer*, a criminal defendant was charged with bankruptcy fraud and the same attorney who represented him in the bankruptcy proceedings in which he was alleged to have committed fraud represented him in the criminal proceedings. This Court affirmed the magistrate judge's decision to disqualify counsel, relying on *Wheat*, because the attorney was "likely to be called as a witness" by the government even if he was not called by the defense. *Id.* at *4. Consequently, in language quoted by the district court's memorandum in the instant case, the magistrate judge in *Timmer* concluded, "developments during the trial might well give rise to a need for [the attorney] to testify even if the defense could not foresee those developments prior to trial." *Id.* at *3-4; *Swafford*, 2005 U.S. Dist. LEXIS 26890 at *26. The instant case does not present as strong a case for disqualifying counsel, for the defendant waived the defense potentially giving rise to the conflict of interest. Nevertheless, we believe that the district judge appropriately explained his decision – *i.e.* that a conflict of interest might arise during trial – and that this decision was thus not arbitrary.

## IV.

The defendant argues that both the first and second counts of the indictment suffer from fatal variances. In the first count, the government charged Swafford with a single conspiracy to aid and abet the manufacture of methamphetamine. And in the second count, the government charged the defendant with a single conspiracy to distribute iodine to be used to manufacture methamphetamine. The defendant contends that the proof offered at trial failed to support the existence of a single conspiracy for either count, but instead only tended to show the existence of multiple conspiracies.

We review the question of whether a variance has occurred *de novo*. *United States v. Caver*, 470 F.3d 220, 235-37 (6th Cir. 2006). "A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 236. In determining whether the evidence can reasonably support only a finding of multiple conspiracies, we view the evidence "in the light most favorable to the government." *Id.* When a defendant first alleges a variance at trial, this Court will reverse a conviction if "a variance occurred and that variance affected [the defendant's] substantial rights." *Id.* at 235; *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946). But where the issue is first raised on appeal, as here, we review for plain error, *Caver*, 470 F.3d at 235, which requires the defendant to prove that the error affected the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

In the instant case, the evidence shows that the defendant was part of multiple conspiracies and not a single conspiracy as charged in the indictment. None of the customers to whom Swafford sold iodine for use in the production of methamphetamine directly interacted with one another except Michelle Dixon and Becky McAllister. And "while a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member," it is necessary to show that each alleged member "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982); *see also* Jury Instructions, J. Apx. p. 625. We have found single conspiracies even where the connections between the co-conspirators were minimal. *See, e.g., United States v.*

---

[2]The district court denied the government's motion to disqualify the firm from representing JES, Inc., a co-defendant. This fact provides additional support that the district court exercised appropriate discretion and did not arbitrarily disqualify counsel.

*Kelley*, 849 F.2d 999, 1003 (6th Cir. 1988) (holding that a defendant who was involved only in distributing drugs in San Francisco was part of a single conspiracy with a common distributor who also operated in Washington and Los Angeles).

Nevertheless, the evidence proved at this trial demonstrated the existence of multiple conspiracies between the defendant and many of the Broadway customers who testified. Even viewing the evidence in the light most favorable to the government, the government failed to prove a common goal as between the customers, a necessary element of a single conspiracy charge. That is, the government's metaphorical argument that this was a "wheel conspiracy" (or "hub-and-spoke" conspiracy) – wherein the defendant served as the hub connected to each of the customers via a spoke (*i.e.* provision of iodine) – fails because no common goal or enterprise existed.[3] As the Supreme Court described in *Kotteakos*, "without the rim of the wheel to enclose the spokes," a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants. *Kotteakos*, 328 U.S. at 755. "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002); *see also United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) ("for a wheel conspiracy to exist, those people who form the wheel's spokes must have been *aware* and must do something in furtherance of some single, illicit enterprise") (emphasis in original) (citation omitted). Here, we have exactly this type of rimless conspiracy. The government failed to prove that the methamphetamine cooks were acting in furtherance of a common goal or that there was any significant interdependence among them. *See Chandler*, 388 F.3d at 811. Consequently, there is a variance between the crime charged (a single conspiracy) and the crime proved (multiple conspiracies).

Finding a variance does not mandate a reversal; in order for the variance to constitute reversible error, a defendant must at the very least show that this variance prejudiced him. *See Caver*, 470 F.3d at 237 (a variance is not *per se* prejudicial). "Where the evidence demonstrates *only* multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *Id.* (citing *Kotteakos*, 328 U.S. at 765) (emphasis in original).

This case does not present the two most problematic forms of prejudice: (1) where the defendant is unable to present his case and is "taken by surprise by the evidence offered at trial," *United States v. Budd*, 496 F.3d 517, 527 (6th Cir. 2007) (quoting *Berger v. United States*, 295 U.S. 78, 82 (1935)), or (2) where the defendant is "convicted for substantive offenses committed by another." *United States v. Friesel*, 224 F.3d 107, 115 (2d Cir. 2000). Swafford had notice of the crimes charged against him and was not convicted for substantive crimes committed by another. But this observation does not end the enquiry, for as the Second Circuit describes, prejudice may also exist where "'spillover' [occurs] because of a large number of improperly joined defendants." *Id.* Indeed, "the possibility of prejudice resulting from a variance *increases with the number of defendants* tried and the number of conspiracies proven." *United States v. Bertolotti*, 529 F.2d 149, 156 (2d Cir. 1975) (emphasis added) (citing *Blumenthal v. United States*, 332 U.S. 539, 559 (1947)).[4] The sale of iodine to many unrelated customers is no different from the sale of birdseed

---

[3] Defining the common enterprise as simply the illegal sale of drugs would render the conspiracy an essentially limitless enterprise. Additional facts must connect the putative co-conspirators. Moreover, this is not a "chain conspiracy" where the existence of a single conspiracy is proved by the fact that operators at different levels are connected by a common scheme or enterprise.

[4] In the instant case, the methamphetamine cooks were co-conspirators and not co-defendants. Nevertheless, as discussed *infra*, we still believe that the same problem of prejudice exists.

to many birdwatchers or the sale of other products at retail to many users who are unconnected to each other.  Where there is no connection between users of the same product but the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity, the harm to the public will appear to be greater and the participants more culpable.  Here, the appearance of coordinated criminal activity appears more culpable than individual sales, implicating the Supreme Court's long-standing admonition that "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes."  *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943).

In the instant case, the spillover problem is manifestly evident.  More than 20 Broadway customers testified about making iodine purchases, and while some of the methamphetamine cooks testified to frequent purchases of large quantities of iodine, others testified to limited purchases of small amounts.  In the latter situation, a jury might have concluded that Swafford did not have the requisite knowledge that the iodine was being used for methamphetamine production as opposed to a legitimate purpose.  Similarly, the other, extrinsic testimony as to Swafford's knowledge of the illicit use of iodine varied.  Several witnesses testified that the defendant exhibited suspicious behavior demonstrating such knowledge – for example, one witness testified that Swafford warned him that federal agents were in the store – but the testimony regarding other transactions was arguably indistinguishable from a legitimate buyer-seller relationship.  Here, the variance created the following problem: instead of having to prove each of the multiple conspiracies, which was necessary due to the failure to demonstrate a single conspiracy, the government offered evidence only as to the alleged single criminal enterprise.  Consequently, the jury could simply seize upon the most significant iodine sales and the most suspicious behavior exhibited by Swafford and then apply that evidence against the defendant *vis-à-vis* each of the alleged co-conspirators.  This distributive application of evidence diminishes the level of proof necessary for convictions based on the multiple conspiracy theory proven at trial.  Under such circumstances, it is impossible to say that the variance did not affect the outcome of the trial.  A jury might have concluded that conspiracies existed between the defendant and certain customers but not others.  The resulting guidelines sentence, in turn, would perhaps have been lower.[5]  The jury instructions reflected this concern and informed the jury that they could only convict the defendant if they found that he was a member of a single conspiracy.  J. Apx. p. 624.  Because the jury could not have found the existence of a single conspiracy, and because the proof offered as to the multiple conspiracies prejudiced the defendant, the convictions on counts 1 and 2 must be overturned.[6]

## V.

The defendant argues that the district court erred by denying a motion to strike or elect

---

[5]The single conspiracy convictions allowed the government to attribute all of the defendant's iodine sales to the production of methamphetamine.  This quantity, as discussed in footnote 1 *supra*, informed the applicable guidelines sentencing range.  Had the government been required to prove each of the multiple conspiracies, the amount of iodine/methamphetamine – and the attendant guidelines range – may very well have been lower.

[6]Our decision that there was a fatal variance in both counts 1 and 2 of the superceding indictment, which requires a remand for resentencing, allows us to pretermit the following issues raised by the defendant: (1) that count 1 of the indictment failed to state an offense; (2) that the government offered insufficient testimony as to the existence of either conspiracy; and (3) that the district court improperly calculated the statutory maximum under 21 U.S.C. § 841(c), which is ten years, not twenty.

The defendant also raises two other issues.  First, the defendant's argument that the verdict form was flawed is simply without merit.  Second, the defendant's argument that the district erred in denying his Rule 29 motion, in which he contended that the indictment failed to state the time of the crimes with sufficient accuracy, is without merit.  The government is not required to prove the exact date of an offense if, as was the case here, the indictment includes the language "on or about" and the date proved at trial is "reasonably near" the date alleged in the indictment.  *See United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989).

counts of multiplicity, thereby implicating the double jeopardy clause's prohibition against multiple punishments for the same crime. Whether an indictment suffers from a problem of duplicity or multiplicity is a legal question that this Court reviews *de novo*. *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002).

"'Multiplicity' is charging a single offense in more than one count in an indictment." *United States v. Lemons*, 941 F.2d 309, 317 (5th Cir. 1991). Multiplicity may result in a defendant being punished twice for the same crime, *United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994), or may unfairly suggest that more than one crime has been committed. *United Stats v. Dixon*, 921 F.2d 194 (8th Cir. 1990). To determine if multiplicity exists, a court must first look to "whether Congress intended to punish each statutory violation separately." *Pandelli v. United States*, 635 F.2d 533 (6th Cir. 1980) (quoting *Jeffers v. United States*, 432 U.S. 137, 155 (1977)). Where this enquiry does not resolve the issue, "the general test for compliance with the double jeopardy clause looks to 'whether *each* provision requires proof of a fact which the other does not.'" *United States v. Davis*, 306 F.3d 398, 417 (6th Cir. 2002) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (emphasis added)). Using the same evidence to prove violations of two statutes does not violate *Blockburger*. *See United States v. Medina*, 992 F.2d 573, 588 (6th Cir. 2003). But in examining whether the elements overlap the *Blockburger* analysis does require us to "go further and look to the legal theory of the case or the elements of the specific criminal cause of action for which the defendant was convicted without examining the facts in detail." *Pandelli*, 635 F.2d at 538.

In the instant case, the defendant argues that Counts 3 through 21, which are based on 21 U.S.C. § 843(a)(6)[7] include the same elements as Count 22 through 40, which are based on 21 U.S.C. § 841 (c)(2).[8] The government relies on *United States v. Miller*, 870 F.2d 1067 (6th Cir. 1989), for the proposition that Congress intended to punish the defendant under both statutes. This case is not controlling, for in *Miller*, the defendant possessed marijuana with the intent to distribute it *and* manufactured (*i.e.* grew) the marijuana. As the *Miller* Court described,

> The offense of possession with intent to distribute undoubtedly can be proved without any proof of manufacture of that substance. Furthermore, the offense of manufacturing, while likely involving proof of possession, does not require any proof regarding an intent to distribute the substance.

870 F.2d at 1071. In *Miller*, the manufacturing of marijuana, itself, constituted a violation of the statute. The *Miller* court thus reasonably concluded that Congress sought to criminalize both the manufacture of marijuana and its possession with the intent to distribute. In the instant case, it is not obvious why Congress would twice want to criminalize iodine *vis-à-vis* its role in methamphetamine production. Perhaps Congress sought to distinguish regular, unlisted chemicals from listed chemicals, and to punish the latter more harshly. However, neither is inherently a crime, unlike manufacturing or possessing marijuana; only when the possession or distribution of iodine is tied to the manufacturing of a controlled substance (i.e. methamphetamine) does it become illegal. Thus, we believe that § 843(a)(6) comprises a "catch-all" statute proscribing the possession of certain items with the intent of assisting the manufacturing of illegal drugs, while § 841(c)(2)

---

[7] 21 U.S.C. § 843(a)(6) reads: "[T]o possess any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of this title or title II." The controlled substance at issue in the case is methamphetamine.

[8] 21 U.S.C. § 841(c)(2) reads: "possesses or distributes a *listed chemical* knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this title." (Emphasis added.) Again, the controlled substance is methamphetamine.

specifically addresses the use of listed  chemicals to facilitate the same goal.  The latter is thus a more specific statute, one that specifically addresses the situation at hand.

Under the *Blockburger* test, Counts 22 through 40 include an element that the government was required to prove – distribution – that is not present in Counts 3 to 21.  But in order to satisfy *Blockburger* – and not be a lesser included offense – Counts 3 to 21 must similarly include an element not present in the other.  The government states in a conclusory fashion that possession and distribution necessarily include elements not present in the other; however, distribution of iodine presupposes that the defendant possessed iodine at some point.  *See* Charge to the Jury, J. Apx. p. 624 (defining "distribute" as "to deliver or to transfer possession or control of something from one person to another").  Consequently, the indictment fails to satisfy *Blockburger* on its face and the indictment suffers from multiplicity.  Furthermore, the "legal theory" of this case is the same under both statutes – namely, that the defendant distributed iodine (whether described as a "chemical" or a "listed chemical") to facilitate the production of methamphetamine. *See Pandelli*, 635 F.2d at 538.

Because multiplicity exists, the charges must be merged under § 841(c)(2) to satisfy the prohibition against double jeopardy.  *See Pandelli*, 635 F.2d at 539. In turn, the consecutive sentences imposed must be vacated.  On remand, the district court should sentence the defendant according to the 19 substantive violations of § 841(c)(2).

## VI.

For the foregoing reasons, we AFFIRM the district court in part, REVERSE in part, and REMAND for resentencing in accordance with this opinion.