**UNITED STATES of America,**
**Appellee,**

v.

**Jon GEIBEL, Chad L. Conner,**
**and Gordon K. Allen, Jr.,**
**Defendants–Appellants.**

**No. 02–1645(L), 02–1651, 02–1667.**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 20, 2003.

Decided: May 28, 2004.

---

Robert J. Anello, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, N.Y. (Daniel L. Rashbaum, Morvillo, Abramowitz, Grand, Iason & Silberger, P.C.; Neil & Harwell, PLC, Nashville, TN, on the brief), for Defendant–Appellant Geibel.

Arza Feldman, Feldman & Feldman, (Steven A. Feldman, on the brief), Hauppauge, NY, for Defendant–Appellant Allen.

Jane Simkin Smith, Millbrook, N.Y., for Defendant–Appellant Conner.

I. Bennett Capers, assistant United States Attorney for the Southern District of New York, (James B. Comey, United States Attorney for the Southern District

of New York and Gary Stein, assistant United States Attorney, on the brief), New York, NY, for Appellee.

Before: OAKES, POOLER, and WESLEY Circuit Judges.

POOLER, Circuit Judge.

Defendants–Appellants John Geibel, Chad L. Conner, and Gordon K. Allen, Jr. appeal from judgments of conviction entered on October 29, 2002 in the United States District Court for the Southern District of New York (Daniels, *J.*) following a three-week retrial. The jury convicted each defendant on each count in which he was named. The Indictment charged defendants with conspiracy to commit insider trading, numerous counts of insider trading, conspiracy to commit commercial bribery, and commercial bribery. On October 18, 2002, the district court sentenced Conner, Allen and Geibel principally to 50, 40 and 36 months incarceration, respectively.

## BACKGROUND

In late 1997, John Freeman, employed as a part-time temporary word processor at Goldman Sachs & Co., Inc. ("Goldman Sachs"), a global investment banking and securities firm, and later Credit Suisse First Boston ("CSFB"), another investment bank, began misappropriating nonpublic information concerning impending mergers and acquisitions. Rather than trade in his own account, Freeman disclosed that information to approximately 15 to 20 individuals with the understanding and agreement that they would share a portion of their trading profits with him. Freeman began disclosing inside information to two individuals, James Cooper and Benton Erskine, whom he met in an Internet chatroom. Freeman's agreement with them, like with others, was that he would provide inside information for a percentage of their trading profits. The trio

agreed that Freeman would be paid a percentage, which varied from 10%, to 30%, to 50%, of Cooper's and Erskine's trading profits. Freeman initially met with Cooper and Erskine in an AOL chatroom entitled the "YAK chatroom" to provide them with tips. Eventually, Freeman used three different AOL chatrooms, and later, upon growing concerns of detection, communicated with them through instant messaging. To further avoid detection, their communications were sometimes coded.

During the course of the scheme, Cooper received Freeman's permission to tip other individuals that might be able to assist them. Cooper asked and received permission from Freeman to include his brother, Benjamin Cooper, who was an active stock trader. On some occasions, Benjamin would communicate directly with Freeman over the Internet. Cooper also asked and received permission from Freeman to include Charles Deon Benson, a wealthy dentist in Smith Grove, Kentucky. Because Benson frequently traded large amounts of money in the stock market, he could assist the scheme by acting as a middleman to purchase securities.

Cooper, however, also tipped certain individuals without Freeman's knowledge or consent. In September 1997, Cooper contacted defendant Conner, who was a stockbroker at the Bowling Green branch office of Morgan Keegan & Company, Inc. ("Morgan Keegan"), and told him that he met an unnamed source on the Internet who was willing to share inside information for a percentage of the trading profits. Conner indicated that he wanted to receive this information and told Cooper that he knew how to trade on inside information without detection. Conner told Cooper that, for example, Cooper should never purchase more than fifty call options at one time because larger purchases would appear suspicious. He also told Cooper to

collect "research" about securities purchased pursuant to Freeman's tips in case they were subsequently questioned about their trades.

Cooper began regularly tipping Conner without Freeman's knowledge. He eventually gave Conner tips on approximately twenty-five prospective deals at Goldman Sachs and CSFB. Conner, in turn, tipped numerous other brokerage clients, including co-defendant Gordon K. Allen, without Cooper's knowledge. Co-defendant Allen, in turn, tipped co-defendant John Geibel and government witness Chan Workman.

Allen and Geibel, both former stock brokers, were partners at Conquest Capital, an oil and gas exploration company in Nashville, Tennessee, and they employed Workman as a bookkeeper. Allen and Geibel engaged in trading through personal brokerage accounts and through joint accounts they shared in the name of their company. Workman testified that Allen instructed him about how to discretely trade on Freeman's information. For example, Allen told him not to purchase more than fifty options at one time. Allen also instructed Workman to compile phony research from the Internet in case their trades were ever investigated. Workman testified that Geibel and Allen both placed calls from Conquest Capital's office to make securities trades using Freeman's tips. He also testified that, in his presence, Allen shared information obtained from Conner with Geibel and that Geibel received checks splitting profits from trades based on Freeman's information. Finally, he testified that Geibel engaged him in speculation about the identity of Conner's source, and eventually deduced that the source was employed at Goldman Sachs in New York.

In November 1997, Morgan Keegan received an inquiry letter from the American Stock Exchange ("AMEX") concerning options that several of Conner's clients, including Cooper, had purchased in the company Oregon Metallurgical Corporation soon before it announced that it was being acquired. Conner told Cooper about the inquiry and directed him to research this corporation over the Internet to fabricate an alternative explanation for the trades. Conner then falsely responded to the AMEX by stating: "After reading about the stock on AOL, the client called and asked my opinion. Upon review of the stock, I told the client technically and fundamentally the stock looked good. Enclosed is a copy of the information the client read on the Internet." Sometime thereafter, Morgan Keegan again received another inquiry letter from the AMEX regarding the purchase of options by some of Conner's clients, including Cooper, in DSC Communications, Inc., shortly before it announced that it was being acquired.

Between September 1997 and Freeman's arrest in January 2000, Freeman received approximately $87,000 in cash as well as other gifts from individuals whom he tipped. Cooper paid Freeman a total of $6,000, of which $4,000 came from Conner. Those payments typically arrived in birthday or greeting cards mailed by Cooper to Freeman at Freeman's daytime job at the Phillip Morris company in New York, New York. The government claims that Allen and Geibel also contributed to payments made to Freeman. Workman testified that Allen solicited contributions from him for one-third of the payment to Freeman. It was his understanding that Allen and Geibel were also each contributing one-third of the payments to Freeman via Conner.

Interestingly, Conner personally traded in only one of the CSFB deals, earning a profit of $2,752. However, according to the government, Conner's tips generated millions of dollars in illegal profits for his

friends and business clients. For example, on June 2, 1998, Cooper, Cooper's brother, Allen, Geibel, Workman, and other clients of Conner each made large purchases of securities or options issued by DSC Communications, Inc. Two days later, on June 4, 1998, DSC Communications announced that it was being acquired by Alcatel, Inc., causing DSC's share price to rise significantly. On this deal alone, the government contends that Conner's clients earned profits in excess of a million dollars. Indeed, Workman, whose annual salary ranged between $30,000–$45,000, testified that he earned illegal profits of approximately $140,000 during the course of the two-year scheme.

In the early fall of 1998, Freeman left Goldman Sachs to work part-time for CSFB. While Freeman continued to misappropriate information from CSFB, defendants believed that the information they were now receiving was not as profitable as it had been in the past. Specifically, CSFB's mergers and acquisitions appeared to involve smaller companies, and since stocks in such companies were not heavily traded, defendants could not purchase a large number of options or shares without raising suspicion. Conner complained about this to Cooper and told Cooper that one of his clients was willing to pay the "New York source" $100,000 to return to Goldman Sachs. Cooper communicated this offer to Freeman. Allen advised both Geibel and Workman that Conner was going to offer his New York source $100,000 to return to Goldman Sachs.

Prior to this, Freeman had been apprehended by the FBI and had agreed to assist them. He permitted the FBI to monitor conversations and instant message exchanges with other tippees. Consequently, Cooper was arrested on February 19, 2000 and he also agreed to cooperate with the FBI. On February 23, 2000, defendants Conner and Cooper participated in a three-way telephone and on-line conversation with an FBI agent posing as Freeman. During this telephone conversation, Conner reiterated his offer to pay Freeman $100,000 to return to Goldman Sachs. The agent posing as Freeman asked Conner to personally deliver $5,000 to Atlantic City and Conner agreed (the "Atlantic City Scheme"). On March 4, 2000, FBI agents arrested Conner in Atlantic City and seized an envelope containing $5,000. Geibel and Allen were arrested several weeks later.

Indictment S3 00 Cr. 731(GBD) charging defendants in eighty-four counts was filed on January 17, 2002. The Indictment charged Conner, Allen, and Geibel with conspiracy to commit insider trading with each other and with Cooper and Freeman, among others, in violation of 18 U.S.C. § 371, and eighty-one counts of insider trading, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, and 18 U.S.C. § 2. The Indictment charged Allen and Conner, but not Geibel, with conspiracy to commit commercial bribery in violation of 18 U.S.C. § 371 (count 83) and charged only Conner with commercial bribery in violation of 18 U.S.C. § 1952(a)(3) (count 84). Conner was named in all eighty-one substantive counts of insider trading. Allen was named in thirty-six substantive insider trading counts and Geibel was named in twenty-three insider trading counts.

The first trial against defendants before Judge Daniels began on June 25, 2001 and ended on July 24, 2001. Judge Daniels declared a mistrial after the jury was unable to reach a unanimous verdict against any defendant on any of the counts. The retrial of defendants, also before Judge Daniels, began on February 25, 2002 and ended on March 20, 2002. The second

jury convicted defendants on all counts. On October 18, 2002, Conner, Allen and Geibel were sentenced principally to fifty months, forty months and thirty-six months imprisonment, respectively.

## DISCUSSION

### I. Conspiracy to Trade on Inside Information

All three defendants claim that the evidence presented at trial did not support the jury's finding of the single, multi-state conspiracy charged in the Indictment. Instead, defendants claim that they participated in a much narrower scheme that did not involve Freeman. We agree.

This court reviews de novo a challenge to the sufficiency of evidence supporting a criminal conviction, *see United States v. Reyes,* 302 F.3d 48, 52–53 (2d Cir.2002), and must affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt. *See United States v. LaSpina,* 299 F.3d 165, 180 (2d Cir.2002) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

"In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. McDermott,* 245 F.3d 133, 137 (2d Cir.2001) (*"McDermott I"*) (internal quotation marks omitted). "Moreover, 'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" *United States v.*

*Berger,* 224 F.3d 107, 114–15 (2d Cir.2000) (quoting *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir.1990)).

In *United States v. Carpenter,* a reporter agreed to provide two stockbrokers with securities-related information prior to its appearance in the Wall Street Journal. 791 F.2d 1024, 1026 (1986). On several occasions, however, one of the stockbrokers, without the reporter's knowledge, passed the information to his friend, Stephen Spratt, with whom the reporter "had no agreement or knowledge." *Id.* at 1035–36. The court reversed the conspiracy conviction for the reporter to the extent that it was based on trades made by Spratt. *Id.* at 1026. The court found that the reporter should not be liable for the trades of the unknown remote tippee because that tippee was not contemplated by the conspirators' trading agreement. *Id.* at 1036. The fact that one of the co-conspirators "used the information … beyond the scope of the agreement" did not make the remote tippee a joint member of the conspiracy. *Id.* (internal quotation marks omitted).

This Court also addressed the issue of remote tipper liability in *McDermott I.* It reiterated the principle that "the essence of conspiracy is the agreement and not the commission of the substantive offense." *Id.* at 137 (internal quotation marks and citations omitted). James J. McDermott, an investment banker, gave his mistress, Kathryn Gannon, confidential securities-related information. *Id.* Unbeknownst to McDermott, Gannon was passing the information to her other lover, Pomponio. *Id.* at 137–38. The court held that, since McDermott had no reason to know of or suspect Pomponio's existence, the scope of the conspiratorial agreement involved only McDermott and Gannon, and not Pomponio. *Id.* at 138. In rejecting the government's argument that all three individuals

were part of the same conspiracy because they had the same purpose, which was to trade on inside information, the court emphasized that conspiracy is not defined by its purpose but rather by "the agreement of its members to that purpose." *Id.* at 137. Accordingly, the court reversed the conspiracy conviction for McDermott. *Id* at 138.

It should be noted that both cases address whether the originating tipper (the reporter in *Carpenter*, the investment banker in *McDermott I* ) was in a conspiracy with remote and unknown tippees. This case is the opposite. Here, the issue is whether defendants, remote tippees, were in a conspiracy with Freeman, the originating tipper. In determining the scope of the conspiracy, the roles played by Defendants are significant. As unknown remote tippees, Defendants were less able to appreciate the full scope of the conspiratorial enterprise. With respect to this observation, few of our decisions involve charges against unknown remote tippees. The one exception is the subsequent *McDermott* case where this Court discussed the liability of Pomponio, the remote tippee. *United States v. McDermott*, 277 F.3d 240 (2d Cir.2002) ("*McDermott II* "). In *McDermott II*, the government conceded that Pomponio, the remote tippee "was not part of a single conspiracy involving McDermott and Gannon." *Id.* at 242 n. 1. On this point, which is central to the inquiry here, the decision says very little. The court only noted that "the government failed to prove a single conspiracy amongst all three co-defendants[,]" and then moved to a variance analysis. *Id.*

Both *McDermott I* and *Carpenter* acknowledged "three hypothetical avenues" for establishing a single conspiracy: (1) if the scope of the trading agreement were broader "to include trading by or for persons other than the small group of conspir-

ators"; (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees. *McDermott I*, 245 F.3d at 137–38, *see also Carpenter*, 791 F.2d at 1036. Each of these three hypothetical situations is also relevant in considering the liability of a remote tippee. Accordingly, each situation is addressed below, as well as one additional consideration: mutual dependence or benefits among the co-conspirators.

### A. *Scope of the Agreement*

■ Freeman's and Cooper's agreement did not encompass disclosure of information to remote tippees, such as defendants. It is undisputed that Cooper's tips to Conner, and then Conner's tips to Allen and Geibel, were without Freeman's knowledge or consent. None of the defendants ever communicated directly with Freeman. Freeman testified that both he and Cooper were concerned with not spreading the information to too many individuals and took steps to maintain the scheme's secrecy and exclusivity. Although Freeman disclosed the confidential information over the Internet, this does not mean that he had no expectation of privacy. To the contrary, the trio's communications over the Internet were concealed and surreptitious. Freeman used an AOL chatroom named the "YAK chatroom" to tip Cooper and Eskrine. In order for other AOL users to access this chatroom, they would need to know the chatroom's specific name, which was only known to the trio. To further avoid detection, the trio changed chatrooms twice and eventually began communicating through instant messaging. Further, they often coded their communications. Indeed, exclusivity was such a premium that Cooper at one point told Freeman that he wanted Ers-

kine out of the scheme because he felt that Erskine was "telling people about this information." As these measures make clear, the scope of the conspiratorial agreement between Freeman and Cooper was narrow and did not encompass disclosure of inside information to unknown remote tippees such as Conner, Allen, and Geibel.

### B. *Foreseeability of remote tippees*

In light of Freeman and Cooper's safety measures, it was not reasonably foreseeable that inadvertent disclosures to remote tippees were a necessary or natural consequence of this trading scheme. Again, Freeman's tips were not broadcast over the Internet. At best, Freeman disseminated information in a specific chatroom, in code, to two individuals. Further, the reason that Freeman and Cooper endeavored to avoid unauthorized sharing by remote tippees was because they knew that trading by numerous individuals on Freeman's tips would directly undermine the scheme by increasing their chance of detection. Accordingly, both Freeman and Cooper reasonably expected the other to be discrete with the precious information because the success of the conspiratorial scheme depended on exclusivity. *Contrast United States v. Alessi*, 638 F.2d 466, 474 (2d Cir.1980) (holding that, because the nature of the conspiracy, running stolen credit cards, necessarily required a large group of retailers, conspirators should have suspected that the scheme included remote and unknown members).

Cooper actively took steps to conceal the number of his tippees from Freeman. Although Cooper informed Freeman about certain co-conspirators' involvement in the scheme, such as his brother and Charles Deon Benson, the wealthy dentist in Kentucky, he did not tell him about Conner. In fall 1999, Cooper deceptively told Freeman that someone was willing to pay $10,000 per quarter for information on prospective deals. In response, Freeman asked "[I]s this only the Big D [code name for Benson]?" Cooper deceptively answered, "only one." Conner, in fact, made the offer. This exchange demonstrates that Cooper felt compelled to deceive Freeman about Conner's participation because he was aware that he was not authorized to spread the information to others. As a final note, if Freeman knew or even suspected that Cooper was passing the tips to others, he certainly would have sought additional trading profits and would have expected more than the paltry $6,000 that he actually received from Cooper. In fact, Freeman testified that he was "amazed" when he learned after his arrest about all of the remote tippees that traded on his information and the amounts that they earned.

In short, unknown and remote tippees, such as defendants, were not contemplated by the Freeman–Cooper conspiracy. Instead, they received inside information in contravention of the conspiracy's purpose and against its likelihood of success. Accordingly, it was neither reasonable nor foreseeable that this information would end up in defendants' possession.

### C. *Actual Awareness*

It is undisputed that Freeman was unaware of defendants' role in the scheme. On direct examination, Freeman testified that he only tipped certain acquaintances whom he knew personally, with the sole exception of Cooper and Erskine, whom he met over the Internet. Defendants, however, were actually aware of Freeman's role in the scheme. The issue, then, is whether a single conspiracy exists where remote tippees are actually aware of the originating tipper, but the originating tipper is not aware of the remote tippees. In *McDermott I* and *McDermott II*, the court

was faced with a comparable situation involving three people: an insider source, a tippee, and a third person with whom the tippee secretly shared information, who was unknown to the insider source but was himself aware of the insider source. We held there was no single conspiracy because there was no evidence that the agreement extended to the possible passing of insider information to third persons in that case. Similarly, in this case, defendants' awareness of Freeman, the source of information, is not sufficient evidence to link them in a conspiracy with Freeman because mere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal. *See, e.g., United States v. Rosenblatt,* 554 F.2d 36, 38 & n. 2 (2d Cir.1977) (holding that federal definition of conspiracy retains traditional, common law requirement of "bilateral" formation which mandates a "meeting of the minds"). Instead, defendants were merely the unintended and unknown recipients of confidential inside information. Although they may have been vaguely aware of the source of their seeming good fortune, such awareness alone does not render them members of a conspiratorial enterprise, least of all in an enterprise that neither wanted nor needed their participation.

## D. Mutual Dependence

■ In determining whether a single conspiracy exists, the court may consider whether there was "mutual dependence among the participants[.]" *United States v. Williams,* 205 F.3d 23, 33 (2d Cir.2000) (quoting *United States v. Vanwort,* 887 F.2d 375, 383 (2d Cir.1989)). In this case, defendants and Freeman were not mutually benefitted by defendants' participation in the scheme. Instead, the sharing of information inured only to the benefit of the defendants, not Freeman. While the government contends that Freeman received kickbacks from remote tippees, the financial benefits that he actually received from defendants' unknown participation in the trading scheme were trivial (at most, Freeman received $6,000, of which $4,000 came from Conner), especially compared to the substantial amount of money that remote tippees were making. Any benefits given to Freeman by defendants were informal and gratuitous, rather than disbursed pursuant to a formal agreed-upon exchange, such as a set percentage of the trading profits. Although a significant or substantial contribution to a criminal enterprise is not required to establish a single conspiracy, we hold that in this case, the lack of mutual dependence between Freeman and defendants weighs heavily in defendants' favor.

\* \* \* \* \* \*

In conclusion, the government failed to establish a single conspiracy between Freeman and defendants as alleged in the Indictment. The scope of the conspiratorial agreement between Freeman and Cooper did not encompass disclosing information to remote tippees in defendants' position. Freeman neither knew of nor should have expected defendants' use of the information, and defendants' vague awareness of Freeman's role in the scheme does not render them co-conspirators. Further, Freeman benefitted little from Defendant's use of the information. Accordingly, defendants were not in a conspiracy with Freeman to trade on inside information.

## II. Variance and Substantial Prejudice

■ Although eight defendants were involved in a conspiracy with each other to trade on inside information. "[W]hen a defendant is charged with a single conspiracy among multiple members, and the proof at trial shows that he conspired with

some, but not all, of those members, the variance is subject to the harmless error rule." *McDermott II,* 277 F.3d at 242. In order to merit reversal, "the variance must have caused the defendant 'substantial prejudice' at trial." *Id.* (internal quotation marks omitted). In evaluating substantial prejudice in this context, the essential question is whether the jury convicted the defendant "on evidence unrelated to his own alleged activity." *United States v. Washington,* 48 F.3d 73, 80 (2d Cir.1995). More specifically, a court will look at:

> (1) whether the court gave a *Pinkerton* charge; (2) whether statements of persons not in the conspiracy were used against the defendant; (3) whether there was prejudicial spillover due to a large number of joined defendants; and (4) whether any inflammatory or shocking evidence came in against the defendant.

*McDermott,* 245 F.3d at 139 (citing *United States v. Johansen,* 56 F.3d 347, 351 (2d Cir.1995), *United States v. Berger,* 224 F.3d 107, 115 (2d Cir.2000), and *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

Here, the district court gave a *Pinkerton*-style charge, which instructed the jurors that, in weighing the other charges, they could consider against that defendant "acts [that] were done and statements [that] were made [by claimed co-conspirators] in the defendant's absence and without his knowledge." However, considerations of other factors "strongly militate against a finding of substantial prejudice." *Berger,* 224 F.3d at 116. Only three defendants were tried together, thereby limiting the risk of prejudicial spillover due to an unwieldy number of defendants. Further, the district court correctly instructed the jury that it could consider *Pinkerton* liability only after it first found that the corresponding conspir-

acy existed. Moreover, it also gave the jury a standard limiting instruction: "[t]here are three defendants on trial before you. You must, as a matter of law, consider each count of the indictment and each defendant's involvement in that count separately[.]" Thus, the giving of a *Pinkerton*-style charge did not substantially prejudice the defendants. *See Berger,* 224 F.3d at 116; *United States v. Harwood,* 998 F.2d 91, 100 (2d Cir.1993) (finding that the giving of a *Pinkerton* instruction did not prejudice the defendant because there was substantial other evidence supporting the conviction).

Finally, to conclude that defendants were prejudiced by the variance, we must find that there was a "substantial likelihood that the jury considered evidence of the broad conspiracy charged in the indictment in deciding [defendants' guilt] of the more limited conspiracy established by the evidence." *Washington,* 48 F.3d at 80 (finding "no reason to believe that the jury convicted [defendant] on evidence unrelated to his own alleged activity"). A review of each defendant's role in the scheme shows that none of them suffered substantial prejudice as a result of the variance.

### A. *Conner Was Not Substantially Prejudiced*

Conner was not substantially prejudiced by the variance because he was heavily involved in the trading scheme and the majority of evidence adduced at trial pertained to his conspiratorial activities. Conner entered into an agreement with Cooper, a direct tippee, and assisted the scheme by showing Cooper how to purchase securities based on inside information without detection. For example, he told Cooper that he should not purchase more than fifty call options at any one time and that Cooper should collect "research" about the securities. Further, in Novem-

ber 1997, he assisted Cooper in fabricating an explanation to AMEX's inquiry into one of Cooper's trades based on Freeman's tips. He also participated in a recorded three-way telephone and on-line conversation with Cooper and an FBI agent posing as Freeman. Finally, he was apprehended taking $5,000 to Atlantic City with the purpose of inducing Freeman to return to Goldman Sachs.

Thus, the evidence presented at trial relating to Conner's conspiratorial activities was overwhelming. Because Conner suffered little prejudice from being tried as Freeman's co-conspirator, his conspiracy conviction must be affirmed.

### B. *Allen Was Not Prejudiced By The Variance*

■ Allen claims that he was prejudiced by the variance because inclusion of Freeman as a co-conspirator permitted the government to introduce highly damaging evidence about the Freeman–Cooper conspiracy that was unrelated to the narrower conspiracy between defendants. As examples of such prejudicial or inflammatory evidence, Allen cites to testimony regarding Freeman's misappropriation of information, Freeman's financial arrangement with Cooper, Freeman and Cooper's attempts to conceal their conduct by creating private chatrooms and coded instant messages, and Freeman's receipt of $87,000 in illegal profits largely from sources other than defendants.

As a general matter, such testimony is not necessarily inflammatory or shocking. *Contrast Johansen*, 56 F.3d at 352 (variance deemed substantially prejudicial where the co-conspirator's unrelated conducted involved violence and organized crime activities). Moreover, the central tenet of Allen's argument, that such information would not have been presented against him had he been tried for conspir-

ing only with Conner and Geibel is unavailing because proof of the substantive insider trading charges required the government to establish that Freeman had misappropriated inside information. *Cf. Carpenter v. United States*, 484 U.S. 19, 26–27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (misappropriation is an element for conspiracy to trade on inside information). Because the government was required to introduce proof of Freeman's thefts and proof of criminal intent, Allen was not substantially prejudiced by the inclusion of this testimony at trial.

Moreover, although the government may not have been able to submit all of its evidence regarding Freeman's deceptive practices, payments, and other covert activities, the variance was still harmless because the government submitted substantial evidence of Allen's individual involvement in the scheme. For example, Workman testified that Allen solicited contributions from him to be sent to the New York source and he instructed him about what precautions they needed to take to trade on Freeman's information without detection. Allen drove Conner to the airport so that Conner could travel to Atlantic City and drop off $5,000, of which $3,500 came from Allen. Thus, even if not all of the evidence regarding Freeman's conspiratorial conduct would have been admissible against Allen, in light of the overwhelming evidence of Allen's involvement in the conspiracy, he suffered little prejudice as a result of the variance. Accordingly, Allen's conviction for conspiracy to trade on insider information must be affirmed.

### C. *Geibel Was Not Substantially Prejudiced By The Variance*

■ Whether Geibel was substantially prejudiced by the variance is a closer case. There exists a large disparity between the

government's case against Conner and Allen and its case against Geibel. Without Freeman in the scheme, the government would have been forced to limit its evidence regarding Freeman and Cooper's conspiratorial activities. On the other hand, evidence of acts committed by co-conspirators Conner and Allen in furtherance of the conspiracy would still have been admissible. It is clear that Geibel was, at minimum, in a conspiracy with Conner and Allen. It is axiomatic that all acts and statements committed by one co-conspirator in furtherance of the conspiracy are admissible against all members of the conspiracy. *See United States v. Russo,* 302 F.3d 37, 45 (2d Cir.2002), *cert. denied,* 537 U.S. 1112, 123 S.Ct. 902 (2003). Thus, evidence regarding Allen's and Conner's statements and actions in furtherance of the conspiracy, including their payments and other gifts to Freeman, and Conner's relationship to other tippees, could have been admitted against Geibel.

█ While evidence regarding the Atlantic City Scheme may have been dramatic and inflammatory, this evidence was also admissible against Geibel because it was committed by his co-conspirators in furtherance of their scheme. Although Geibel contends that he had stopped trading on Freeman's information approximately one year before this scheme was even hatched, his inaction does not amount to a withdrawal from the conspiracy. "To withdraw from a conspiracy, a person must take some affirmative action either by making a clean breast to the authorities or communicating the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Jackson,* 335 F.3d 170, 182 (2d. Cir.2003) (internal quotation marks and alterations omitted). Since Geibel did neither of the two, he is thus not relieved of liability for acts committed by his co-conspirators. The vari-

ance analysis here is solely limited to whether Geibel was prejudiced by the inclusion of *Freeman* in the conspiracy. Even if the Indictment should have excluded Freeman as a co-conspirator, Geibel would have been tried with Conner and Allen, and thus evidence surrounding the Atlantic City Scheme still would have been introduced.

Finally, the government submitted sufficient evidence at trial establishing Geibel's conspiratorial conduct. Specifically, trading records indicate that Geibel purchased securities or options in deals that were the subject of Freeman's tips, and often within days of other Freeman tippees making similar purchases. The government submitted by stipulation trading records showing that Geibel purchased options in DSC Communications options prior to DSC Communications' announcement that it was being by another corporation. Workman testified that Allen gave Geibel inside information and that Geibel placed calls from their office to trade on such information. Further, Workman testified that Geibel had engaged him in speculation about the identity of Conner's tipper, and deduced that the tipper probably worked at Goldman Sachs in New York.

Although Geibel's participation in the trading scheme was limited by comparison to Allen's and Conner's participation, the only evidence that would have been excluded evidence regarding Freeman and Cooper's conspiratorial activities. Geibel was not substantially prejudiced by the variance. Accordingly, Geibel's conviction for conspiracy to trade on insider information must be affirmed.

### III. Venue

█ This Court reviews a district court's ruling regarding venue de novo. *See United States v. Svoboda,* 347 F.3d 471 (2d Cir.2003). "Because it is not an ele-

ment of the crime, the government bears the burden of proving venue by a preponderance of the evidence." *United States v. Smith*, 198 F.3d 377, 382 (2d Cir.1999). This Court reviews the sufficiency of the evidence as to venue in the light most favorable to the government, crediting "every inference that could have been drawn in its favor." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir.1994).

 A criminal defendant has the right to be tried in the "district wherein the crime shall have been committed[.]" U.S. CONST. AMEND. VI; *see* FED.R.CRIM.P. 18. "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Svoboda*, 347 F.3d at 482–83 (quoting, in part, *United States v. Cabrales*, 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (quotation marks omitted)). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *Id.* at 483. Finally, "when a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

### A. Venue For The Conspiracy Count

 "In a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *Smith*, 198 F.3d at 382

(internal quotation marks and citations omitted). In this case, Freeman was not a member of defendants' conspiracy, and thus his acts in New York cannot form the basis for venue in the Southern District of New York ("SDNY"). Our analysis then turns on whether any acts taken in furtherance of the narrower conspiracy between and among the defendants were committed in the SDNY.

 With respect to this count, defendant Conner made two significant contacts with the SDNY: (1) Conner sent a letter to the AMEX in New York falsely stating the reasons for Cooper's trades in a corporation that was the subject of Freeman's tips; and (2) Conner participated in a three-way conversation with an undercover FBI agent in New York posing as Freeman. These two contacts were sufficient to establish venue for the conspiracy count in the SDNY. *See, e.g., United States v. Kim*, 246 F.3d 186, 192–93 (2d Cir.2001) (wire transmissions were overt acts of the conspiracy and that alone was sufficient to establish venue); *Naranjo*, 14 F.3d at 145 (telephone calls to forum were sufficient to establish venue). Further, because Conner committed these acts in furtherance of defendants' trading scheme, venue was also proper for co-conspirators Allen and Geibel. Accordingly, even without consideration of Freeman's acts in New York, defendants were properly tried on the conspiracy count in the SDNY.

### B. Venue For The Eighty Substantive Insider Trading Counts

 "With respect to the individual securities counts ... the venue provision of the Securities Exchange Act of 1934 provides that '[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred.'" *Svoboda*, 347 F.3d at 483 (quoting 15 U.S.C. § 78aa). In determining the

constitutionally appropriate venue for an action, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it .... not the anterior criminal conduct." *Cabrales,* 524 U.S. at 6–7, 118 S.Ct. 1772 (internal quotation marks and citation omitted).

With respect to these counts, the government asserts the following contacts with the SDNY: the confidential information was initially misappropriated in New York by Freeman; each defendant was aware that the originating tipper worked at and misappropriated information from investment banks in New York; each trade placed by defendants was the direct result of communications between Freeman in New York and Cooper in Kentucky; and each defendant took steps to secure the continued flow of misappropriated information from New York by contributing to cash payments which they knew would then be mailed to Freeman in New York. Finally, the government claims that there is evidence that defendants purchased options through the AMEX in New York in two deals: (1) the Oregon Metallurgical Corporation transaction, alleged in counts 2–7; and (2) the DSC Communications Corporation transaction, alleged in counts 38–44.

 For the majority of the insider trading counts, defendants' contacts with the SDNY are insufficient to establish venue. Aside from two specific deals, the government submits no evidence showing that defendants directly contacted New York when they engaged in insider trading. The government failed to establish that defendants' trades, involving primarily the purchase of options, utilized the

facilities of any New York-based securities exchange or brokerage firm. Indeed, the only connection that defendants had with the SDNY is the fact that Freeman initially misappropriated the information in New York. Although Freeman's original thefts may have set in motion the chain of events ultimately leading to defendants' trades, venue cannot be grounded merely on Freeman's initial misappropriation and the fact that the information originated in New York. In *Cabrales,* the Supreme Court held that Missouri was not a proper venue for money laundering offenses even though the laundered funds originated from criminal activity in Missouri. 524 U.S. at 3–4, 10, 118 S.Ct. 1772. The Court found that, even though the scheme originated in Missouri, the actual crime charged against the defendant began, continued, and was completed in Florida. *Id.* at 7–9, 118 S.Ct. 1772. Analogously, although Freeman's actions ultimately resulted in defendants' trades, his conduct was too anterior and remote to confer venue in the SDNY. Indeed, as Geibel aptly notes, to hold otherwise "would be to in effect grant the Southern District of New York carte blanche on venue in virtually all insider trading cases." Geibel Br. at 30.

The only credible evidence showing that the trades charged in the Indictment had any connection with New York were defendants' purchase of options relating to DSC Communications, alleged in counts 38–44, and certain trades relating to Oregon Metallurgical, alleged in counts 2–7. The government submitted, by stipulation, trade confirmation records showing the purchases of options in DSC Communications by Allen, Geibel and by Blue Horseshoe Investments, Allen's and Geibel's joint business account.* The trading records

---

* Defendants argue that this evidence was never submitted at trial and so the jury could not have based its finding of venue on these rec-

ords. This argument is without merit because these trading records were submitted by stipulation and are thus part of the trial

indicate that the purchases of options in DSC Communications Corp. were executed "on the American Stock Exchange." Also, a letter by the AMEX to Morgan Keegan inquiring about Cooper's trades in DSC Communications was part of the trial record, trades which Conner is alleged to have facilitated. There is also documentary evidence showing that Conner responded by sending false answers regarding the reason for Cooper's purchases to AMEX. There was evidence in the record establishing that AMEX is located and headquartered in New York. Accordingly, since there was evidence in the trial record establishing that venue in the SDNY was appropriate, we must affirm defendants' conviction for counts 38–44. *See Svoboda*, 347 F.3d at 483–84 (holding that venue was proper where defendants' only contacts with the SDNY were trades executed on New York-based securities exchanges because the defendant, a savvy investor, could reasonably foresee that his trades likely would be executed on a New York exchange).

With respect to counts 2–7, we find that the government did not submit sufficient evidence showing that Allen's and Geibel's trades occurred over the AMEX. The government submitted evidence showing only that *Cooper's* purchase of call options in Oregon Metallurgical in October 1997 was executed over AMEX. In a letter to Morgan Keegan, sent by fax on November 5, 1997, AMEX inquired into trades conducted by Cooper, among numerous other Morgan Keegan clients, in Oregon Metallurgical; neither Allen's nor Geibel's name was listed. Thus, this fax is no evidence that Allen's or Geibel's trades were also executed over the AMEX; any other con-

clusion requires too large an inferential leap. Accordingly, Allen's and Geibel's convictions for counts 5–7 must be vacated. However, because this letter shows that Cooper's purchase was executed over the AMEX, Conner's conviction for count 2 for assisting Cooper in this trade is supported by record evidence, and must be affirmed. Except as otherwise provided for, all other insider trading convictions must be vacated.

## IV. Commercial Bribery Counts

■ Defendants Allen and Conner challenge the legal sufficiency of the commercial bribery counts as alleged by the Indictment. "The sufficiency of the indictment is a matter of law that is reviewed de novo." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir.2000).

■ To establish a commercial bribery violation, "the government must prove that the defendant used a facility of interstate or foreign commerce to 'make easier or facilitate' the intended unlawful activity, and thereafter did one additional act in furtherance of the unlawful activity." *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir.1991). Here, the Indictment charged Conner with using a facility of interstate travel, and Conner and Allen with conspiracy to use a facility of interstate travel to engage in commercial bribery in violation of New York Penal Law § 180.00 (commercial bribery in the second degree) and § 180.03 (commercial bribery in the first degree). Sections 180.00 and 180.03 both prohibit an individual from conferring, offering, or agreeing to confer "any benefit upon any employee, agent or fiduciary ... with intent to influence his

---

record. After stipulating that the government need not put certain evidence before the jury, defendants cannot now argue that the jury had no basis upon which to reach its decision on this disputed fact. *See Diapulse Corp. of*

*America v. Birtcher Corp.*, 362 F.2d 736, 744 n. 7 (2d Cir.1966) (finding that parties are precluded from raising certain objections because they previously agreed to the position in a pre-trial stipulation).

conduct in relation to his employer's or principal's affairs." Section 180.03 contains the additional element that the employer suffers an economic harm in excess of $250.

 Count 83 of the Indictment, which charged Allen and Conner with conspiracy to commit commercial bribery, was legally sufficient. Count 83 incorporates by reference paragraphs 1–34 of the Indictment. Paragraphs 31–34 describe the Atlantic City Scheme and Paragraph 19 describes Cooper's mailing of cash to Freeman in birthday cards. Both allegations can support a conviction for *conspiracy* to commit commercial bribery. Without question, the mailing of cash in birthday cards is sufficient because such payments were made with the intent to induce Freeman to misappropriate information from his employer. Moreover, the Atlantic City Scheme could also independently serve as the factual basis for this count. As a preliminary matter, as the government concedes, it is not commercial bribery merely to pay a person to leave his current employer; rather, the payment must be made for the purpose of inducing the employee to act contrary to the interest of, and inconsistently with, his duties to his current employer. *See People v. Jacobs,* 309 N.Y. 315, 317, 130 N.E.2d 636 (1955). However, in this case, Allen and Conner did not just agree to bribe Freeman to leave CSFB, but also so to continue misappropriating inside information once he returned to Goldman Sachs. Indeed, the Indictment explicitly charges Allen and Conner with attempting to "pay Freeman to return to employment at Goldman Sachs *and to misappropriate information from Goldman Sachs* ...." Indictment at ¶ 43(c). The evidence at trial established that the $5,000 found on Conner in Atlantic City was to be the first of several payments, ultimately totaling $100,000,

that would be delivered to Freeman. Conner's travel to Atlantic City was an overt act taken by a co-conspirator in furtherance of the scheme's overarching goal. Further, the fact that the aim of the conspiracy, for Freeman to return to Goldman Sachs, was never realized is immaterial because the commission of a substantive offense or achievement of the conspirator's ultimate goal is not a prerequisite to a conspiracy offense. *See United States v. Gore,* 154 F.3d 34, 40 (2d Cir.1998). Accordingly, even though the attempted delivery of $5,000 could not alone constitute commercial bribery, because count 83 charges Allen and Conner with entering into a scheme to induce Freeman to continue misappropriating inside information, Allen's and Conner's convictions for count 83 must be affirmed.

 Although count 84 of the Indictment, the substantive commercial bribery count, is legally defective, because Conner has not established jury confusion or prejudice, we do not vacate his conviction for this count. *See United States v. Rodriguez,* 556 F.2d 638, 641 (2d Cir.1977) (noting that, although the indictment erred in setting forth the charge, such additional terms were "mere harmless surplusage"). The Indictment charged Conner with committing commercial bribery and explicitly listed his payment of $4,000 to Freeman via Cooper as an overt act. However, the Indictment also mistakenly incorporates by reference paragraphs of the Indictment that described the Atlantic City Scheme. We note that it was error for the Indictment to incorporate these paragraphs by reference because, as mentioned above, payments to an employee to leave his current employer is not commercial bribery.

Nonetheless, we do not reverse Conner's conviction because the district court clearly instructed the jury that count 84 only involved whether Conner was guilty of

"causing approximately $4,000 in cash to be mailed to John Freeman as payment for information Freeman was misappropriating from his employment." The court never once referred to the Atlantic City Scheme during its instructions on this charge, and Conner did not object to this jury instruction. Indeed, this count solely lists the mailing of payments to Freeman as the overt act. Accordingly, because we presume that the jury followed the judge's instructions, *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir.1987), and nothing in the record supports a finding of jury confusion or prejudice with regard to this count, we must affirm Conner's conviction for count 84.

## V. FINAL ARGUMENTS

Conner's remaining arguments on appeal are without merit and are hereby dismissed.

### *CONCLUSION*

Although the defendants' conspiracy did not include Freeman, the variance between the single conspiracy charged in the Indictment and the multiple conspiracy established at trial did not substantially prejudice any defendant. The SDNY was also the proper venue to try count 1 of the Indictment, conspiracy to commit insider trading. Therefore, defendants' conviction for count 1 is hereby AFFIRMED. However, because Freeman was not a member of defendants' conspiracy, venue in the SDNY for the substantive insider trading counts were not proper. Therefore, defendants convictions for counts 2–82, subject to certain exceptions with respect to counts 2–7 and 38–44, are hereby VACATED. Conner's and Allen's convictions for conspiracy to commit commercial bribery, count 83, and Conner's conviction for commercial bribery, count 84, are hereby AFFIRMED. Accordingly, we

hereby REMAND to the district court for resentencing in conformance with this decision.