<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 17a0655n.06

Case No. 16-6577

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

```
                                    FILED
                                  Nov 27, 2017
                              DEBORAH S. HUNT, Clerk
```

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| DANIEL SCOTT, SR., | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: DAUGHTREY, McKEAGUE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** After a jury trial, Defendant-Appellant Daniel Scott, Sr. ("Scott") was found guilty of conspiracy to possess cocaine with intent to distribute and distribution of cocaine in violation of 21 U.S.C. § 846, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956, and animal fighting conspiracy in violation of 7 U.S.C. § 2156 in the District Court for the Western District of Tennessee. Scott was sentenced to 180 months' imprisonment for the drug charges and 60 months for the animal fighting charge. Scott appeals, arguing that (1) a variance existed between the proof offered at trial and the allegations in the indictment, (2) the district court erred in admitting certain expert testimony, which also violated his confrontation rights, (3) insufficient evidence existed to sustain the convictions, (4) the Government committed prosecutorial misconduct in its closing

argument, and (5) the district court erred in sentencing Scott for his drug convictions. Because all of Scott's claims are without merit, we **AFFIRM** Scott's convictions and sentence.

## I.

In March 2014, Sergeant David Williams ("Sgt. Williams")—a task force officer with the FBI, employed with the Shelby County Sheriff's Office—received information from a Texas district that a drug trafficking organization ("DTO") was transporting cocaine from Texas to various communities for sale, including Memphis, Tennessee. The information stated that a cooperator had identified an individual going by the name "Twin" who was acting as a distributor in Memphis. Sgt. Williams identified the individual as Horris Carpenter. Sgt. Williams then located and photographed Horris Carpenter's residence at 3545 Lakeview Road in the Whitehaven area of Memphis.

Also in March 2014, Joseph Rhoades ("Rhoades")—a Shelby County Sheriff's Office narcotics investigator—conducted an undercover operation centering on Scott's son, Daniel Scott, Jr. ("Scott, Jr."). A confidential informant provided Rhoades with a description of Scott, Jr. and his vehicle, as well as the location of a controlled purchase of cocaine. On March 13, 2014, at the site, Scott, Jr. was apprehended carrying five kilograms of cocaine. The truck Scott, Jr. had driven to the sale was registered to Horris Carpenter, the supposed DTO distributor.

Scott, Jr. waived his *Miranda* rights and provided law enforcement officers with a statement. Scott, Jr. also allowed law enforcement to search two cellular phones recovered during his arrest. Officers identified calls that were missed while Scott, Jr. was detained, including several from his father and several from "Twin." Scott, Jr. identified "Twin" as Horris Carpenter.

Scott, Jr. also provided Sgt. Williams with the names of his collaborators, their phone numbers, and information concerning the source of the organization's narcotics. From Scott, Jr.'s interrogation, investigators posited that the local faction of the DTO consisted of the following members: Juan Carlos Flores, the ringleader and supplier; Horris Carpenter, Flores' distributor; and Morris Carpenter, a distributor for Horris. To confirm, agents placed Flores under physical and electronic surveillance. After witnessing Flores drive to Horris Carpenter's residence in Memphis—in a truck registered to Cordell Wuthrich ("Wuthrich")—agents placed a camera that recorded real-time video near Horris Carpenter's home. In monitoring Horris Carpenter's house, agents witnessed Flores load a tire into Wuthrich's truck.

Months later, the FBI received judicial authorization to monitor Horris Carpenter's telephone. On April 1, 2015, agents intercepted a call between Flores and Horris Carpenter. In a separate call, Scott agreed to deliver "fish" to Horris Carpenter. Similarly, Morris Carpenter agreed to deliver "dog food." Sgt. Williams believed that "dog food" was code for money.

The following day, law enforcement observed Wuthrich and Scott drive to Horris Carpenter's residence. When Wuthrich left, Officers pulled him over and seized $210,000 in cash from the vehicle. Later that day, law enforcement witnessed Scott's vehicle leaving Horris Carpenter's residence around the time of an intercepted call between the two.

On May 21, 2015, after further surveillance, law enforcement again effected a traffic stop of Wuthrich and seized 28 kilograms of cocaine from his vehicle. Law enforcement then arrested Wuthrich as well as the alleged co-conspirators they had identified.

On June 11, 2015, Flores, Horris Carpenter, Morris Carpenter, Wuthrich, Scott, and another individual were indicted on charges of conspiracy to possess cocaine with intent to distribute and of distribution of cocaine, in violation of 21 U.S.C. § 846 (Count 1), and

conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 (Count 2). As to each defendant named here, the indictment charged at least five kilograms of narcotics. On February 17, 2016, a superseding indictment was issued that included a third count for animal fighting conspiracy in violation of 7 U.S.C. § 2156 (Count 3).

Also on February 17, 2016, Scott proceeded to trial. Before commencement of trial, however, Scott pleaded guilty to the Count 3 charge. Scott's trial featured relevant testimony from his son—Scott, Jr.— Rhoades, Wuthrich, and Investigator Joe Hoing ("Hoing"). Scott, Jr. testified that he volunteered to help his father and Horris Carpenter distribute cocaine after they experienced difficulty "getting rid of it." Scott, Jr. stated that when he had a potential narcotics customer, he would call Horris Carpenter, meet him at 3545 Lakeview Road, and obtain the narcotics. Scott, Jr. testified that on March 13, 2014, he received an order for five to seven kilograms of cocaine, obtained the drugs from Horris Carpenter at 3545 Lakeview Road on credit, and was arrested at the controlled purchase. Scott, Jr. also testified that he received three kilograms directly from his father, who had obtained the cocaine from Horris Carpenter. Scott, Jr. further stated that after his arrest and cooperation, while out on bond, he met Flores—the DTO's supplier. Scott, Jr. stated that he drove to Arkansas with Horris Carpenter to give Flores a spare tire filled with money. Scott, Jr. also attested that he heard Flores tell Horris Carpenter that a load of cocaine was going to arrive in Memphis.

Over Scott's objections, Detective Rhoades testified about Scott, Jr.'s arrest. On cross-examination, Rhoades was asked if he was "aware that [Scott, Jr.] had gotten [the narcotics] from somewhere?" (RE 293, Page ID #1020.) Rhoades responded that his confidential informant told him that Scott, Jr.'s father was "involved." (*Id.*) The Government then requested permission to

question Rhoades about this information. After the court granted the request, Rhoades described the confidential informant's details regarding Scott's involvement with the DTO.

Wuthrich's testimony explained that he was a courier for the DTO, delivering cocaine and proceeds from the sale of the product. Wuthrich stated that he received $1,000 for each package he delivered and that the cocaine or funds were hidden in compartments inside a vehicle or a spare tire.

Wuthrich testified that he saw Scott only once, on April 2, 2015, when Flores instructed Wuthrich to drive to Horris Carpenter's residence. Once there, Scott arrived with a shoebox containing cash. Wuthrich said that Horris Carpenter put the shoebox money into a tire that Wuthrich provided. Wuthrich then left and was stopped by law enforcement who seized $210,000 from the tire. Wuthrich's testimony regarding the April 2, 2015 meeting was corroborated by pole-camera video recordings of the vehicles arriving at Horris Carpenter's residence, as well as monitored phone calls between DTO members. Wuthrich stated that he returned to Memphis a short time later to pick up the rest of the money and, in May 2015, traveled to Houston, Texas, to obtain a shipment of cocaine. On May 21, 2015, Wuthrich testified that he was again pulled over. This time, law enforcement officers recovered 28 kilograms of cocaine from a hidden compartment.

The Government also called Investigator Hoing at trial to provide specialized testimony regarding the modus operandi of DTOs. The Government argued that such testimony was based on Hoing's 40-year law enforcement career and thousands of narcotic investigations. In the course of his testimony, Hoing explained that drug dealers employ couriers as a safety net, use multiple phones, and utilize code words. Hoing further explained that he interprets coded communications based on intercepted intelligence, defendant and confidential informant

interviews, and institutional knowledge. After listening to a recorded phone call between Scott and Horris Carpenter, Hoing stated that he believed "fish" was a code word used for money.

After Hoing's testimony, the Government rested. The defense did not present evidence, and the jury heard closing arguments. During its close, the Government stated, in relevant part, that "when the defense tells you that the officers that were involved did not give a hundred percent, it is not even required that we seize drugs and money for a conspiracy. But not only did they identify a number of individuals that were involved in selling this poison into our community, but they seized thirty—" (RE 433, PageID #3101-02.) Scott's counsel objected, stating that "poison in the community, I think—I think the courts have frowned on that kind of language." (*Id.* at PageID #3102.) The trial court overruled and the Government concluded its closing argument without reiterating the objected-to language and without further protest. *Id.*

The jury found Scott guilty on both Counts 1 and 2. Scott moved for a new trial, arguing that (1) the Government failed to connect Scott to the alleged conspiracy, (2) the Government committed prosecutorial misconduct during its closing argument, and (3) Hoing's testimony violated Scott's constitutional rights. The district court denied Scott's motion. Over objection, the district court varied downward from the guidelines and sentenced Scott to 180 months as to Counts 1 and 2 and 60 months as to Count 3.

## II.

On appeal, Scott argues that: (1) a variance existed between the proof offered at trial and the allegations in the indictment; (2) allowing Hoing to testify as an expert witness in reliance on statements made by co-defendants unavailable for cross-examination violated the Confrontation Clause and his testimony was otherwise unreliable; (3) there was insufficient evidence to establish the elements as required under the indictment; (4) the Government committed

prosecutorial misconduct in its closing argument such that Scott was deprived of his right to a fair trial; and (5) the district court erred in sentencing Scott to 180 months based on findings unsupported by competent evidence in the record. We address each of Scott's arguments in turn, finding each without merit.

**A.**

Scott first argues that a variance existed between the proof offered at trial and the allegations in the indictment because the indictment alleged only a single conspiracy and the evidence at trial demonstrated, at best, multiple conspiracies to distribute narcotics. Scott does not challenge his convictions for conspiracy to commit money laundering or animal fighting. We review the question of whether a variance has occurred de novo. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).

A variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those originally alleged. *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003). In a conspiracy case, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the indictment alleged one conspiracy but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies. *See Kotteakos v. United States*, 328 U.S. 750 (1946); *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982). In determining the existence of a variance, we must view the evidence in a light most favorable to the Government. *United States v. Caver*, 470 F.3d 220, 236 (6th Cir. 2006).

"To prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Smith*, 320 F.3d 647, 653 (6th Cir.

2003), *vacated and remanded on other grounds*, 510 U.S. 1180 (2005). "Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often 'chain' conspiracies." *Warner*, 690 F.2d at 549. "Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants." *Id.* Indeed, while a defendant's involvement in one conspiracy does not necessarily warrant imputing criminal culpability for another charged conspiracy, in chain conspiracies, the existence of a single enterprise "is proved by the fact that operators at different levels are connected by a common scheme or enterprise." *Swafford*, 512 F.3d at 842 n.3.

Scott argues that the Government attempted to use two pieces of evidence to connect Scott to two separate conspiracies: (1) Scott Jr.'s statement that he was involved with the DTO because "they needed help"; and (2) the allegation that the conversation between Horris Carpenter and Scott regarding "fish" implicated involvement with Cordell Wuthrich and the DTO. First, there is no question of Scott's involvement with his son or that they jointly conspired with Horris Carpenter. While "they" is a vague statement in a vacuum, Scott, Jr. explicitly testified that both Scott and Horris Carpenter provided him with cocaine for sale, and that Horris Carpenter provided his father with the cocaine distributed to Scott, Jr. And all context surrounding that statement shows that Scott, Jr. was referring to his father and Horris Carpenter. Second, Scott's involvement with Wuthrich is equally clear. The conversation regarding "fish" was immediately followed by pole-camera recordings showing Scott arriving at Horris Carpenters house, and Wuthrich testified that Scott brought a large sum of cash with him.

Scott points to Agent Ross' testimony during sentencing that he had "no evidence to suggest that" Scott knew about the May 21, 2015, Wuthrich transaction at all or that Wuthrich was transporting it to Memphis as proof of a separate conspiracy. The lack of evidence connecting Scott to the narcotics seized from Wuthrich on one occasion, however, does not negate the other evidence regarding the DTO and the conspiracy. As stated, the evidence educed at trial is sufficient to show that they were operating a single venture. This particular transaction can be tied to that venture via Wuthrich and Scott, Jr.'s testimony, and it is not necessary to establish that Scott was aware of the particular transport or sale.

Scott also takes issue with the testimony regarding the May 21, 2016, seizure of cocaine, arguing that it was clear that the narcotics were unrelated to Scott. Instead, Scott argues that the only connections—that Wuthrich met with Scott on April 2, 2015, that Horris Carpenter and Wuthrich knew each other, and that Scott knew Carpenter—are nothing more than the mere associations that are insufficient to prove conspiracy. *See United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999). Again, the Government need not prove that Scott was present, partook in, or was even aware of each conspiratorial act for which there is evidence. Even if direct contact between certain members of the DTO were sporadic, infrequent, singular, or even nonexistent, a reasonable jury could find that they were part of a single "chain" conspiracy. *See Warner*, 690 F.2d at 549 ("[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.").

Thus, the evidence showed that Scott knew about and agreed to participate in a collective venture to sell narcotics in Western Tennessee and elsewhere. The same evidence supporting a finding of Scott's participation in a conspiracy with this son and Carpenter shows that there was

a single conspiracy. Testimony and pole-camera video shows that Horris Carpenter was a principal seller who conducted DTO business from his house, where Scott delivered monies derived from cocaine sales. And Scott was aware of the transfer of money and drugs, and he was involved other parties—including his son. *See United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999) ("The mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed."). Even though he was not present during the seizures, testimony from Scott, Jr. and Wuthrich shows that he provided money that was seized on April 2, 2015. Along with the intercepted calls and pole-camera footage, this is enough to connect those events to a single conspiracy.

In sum, the evidence introduced would not compel a reasonable trier of fact to find multiple conspiracies. Scott, Jr. testified that Flores was the sole supplier of cocaine to Scott and Horris Carpenter. Wuthrich testified that Horris Carpenter arranged for him to deliver narcotics, just as Scott, Jr. testified that his father arranged for him to obtain and sell narcotics from Horris Carpenter. Scott Jr. also stated that he received narcotics from his father personally. Agents seized $210,000 and 28 kilograms of drugs from Wuthrich while he was acting in a manner consistent with the way the DTO was described and after pole-camera video and informant statements substantiated the presence of the co-conspirators. With all inferences being drawn in favor of the Government, Scott has not established a variance between the indictment and evidence at trial. We cannot say that the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies. *See Warner*, 690 F.2d at 548.

**B.**

Scott also argues that the district court erred in allowing Hoing's testimony. On direct examination, Hoing testified about DTOs, as well as his opinion that dealers often used code

words to disguise their transactions. Scott argues that Hoing's testimony lacked any showing of reliable methodology and was a clear attempt by the Government to circumvent the Confrontation Clause by introducing a coconspirator's statements as to the meaning of critical, but vague terms central to the case.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). A court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard," or where we are "firmly convinced" that the trial court "committed a clear error of judgment." *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014) (internal citations omitted).[1]

The district court did not abuse its discretion in admitting Hoing's testimony. Hoing's answers assisted the jury in understanding the defendant's coded conversations and the jury was instructed so it could give proper weight to his testimony. Indeed, Hoing explained that he came to learn of specific code words defendants used to reference drugs and drug-related activity. *See United States v. Dugalic*, 489 F. App'x 10, 16 (6th Cir. 2012) ("This court has repeatedly recognized that, in drug cases, officers can testify as to the meaning of code words.") (citations omitted). Where an agent establishes his basis for concluding that a specific word is coded drug language, through personal knowledge, such testimony is permissible under Rule 701. *See United States v. Lopez-Medina*, 461 F.3d 724, 742-43 (6th Cir. 2006) (in prosecution for conspiracy to distribute cocaine, finding admission of expert testimony from law enforcement warranted as it was relevant and reliable based on agents' extensive experience). Here, Hoing—a qualified law enforcement agent with 40 years of experience and extensive drug-investigation

---

[1] We note that Scott failed to lodge his Confrontation Clause arguments below, thus limiting our review the under the plain-error standard. *United States v. Olano*, 507 U.S. 725, 731-32 (1993). Because his claim fails under abuse of discretion, though, we review both claims under the same standard.

training—provided information which would assist the trier of fact in understanding drug operations. The district court gave a cautionary instruction regarding expert testimony and advising the jury that it did not have to accept Hoing's opinion. This was not an abuse of discretion.

As to Scott's Confrontation Clause argument, Rule 703 allows an expert witness to testify to an opinion that is supported by inadmissible hearsay evidence. Fed. R. Evid. 703. An expert testimony is only barred under *Crawford v. Washington*, 541 U.S. 36 (2004), when the witness is used as a mere conduit for testimonial hearsay, rather than a true expert whose opinion elucidates a specialized factual situation. Hoing's testimony was not provided simply to parrot "out-of-court statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion." *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). Instead, Hoing provided an independent judgment about the statements made to shed light on what the jury may have witnessed on the pole-camera video the day after the intercepted telephone calls. Thus, the district court did not abuse its discretion or otherwise err in allowing Hoing's testimony.

## C.

Scott next lodges a challenge to the sufficiency of the evidence for his conviction, which we review de novo. *United States v. Torres-Ramos*, 536 F.3d 542, 556 (6th Cir. 2008). All inferences must again be made in favor of the Government, and the evidence is sufficient if "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Id.* In making this determination, circumstantial evidence is entitled to the same weight as direct evidence. *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990) (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)). Further, "the uncorroborated testimony of an

accomplice may support a conviction under federal law." *Id.* (quoting *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985), *cert. denied*, 474 U.S. 1068 (1986)). However, we will not remake credibility determinations. "It is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *Gallo*, 763 F.2d at 1518 (quoting *United States v. Bailey*, 444 U.S. 394, 414-15 (1980)).

Scott challenges the evidence on the grounds that it "largely consisted of unreliable and unsubstantiated expert witness testimony derived from inadmissible statements made by a co-defendant in violation of the Confrontation Clause, and admission of cocaine unable to be connected to [Scott] in any manner." (Appellant's Br. at 37.) As we have already concluded, the district court did not err in allowing Hoing to testify as an expert witness or about the content of the intercepted calls between Scott and other members of the DTO. Thus, the evidence was sufficient based on that testimony.

As to the sufficiency of the remaining evidence, the Government need not prove conspiracy by direct evidence. "Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise." *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986). In such conspiracies, "[o]ne can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." *Id.*

As already discussed, there is sparse evidence tying Scott directly to Wuthrich or the funds and cocaine seized. But, in this "chain" conspiracy, the jury could reasonably have inferred that Scott knew that other defendants were participating in the interdependent enterprise, as it could be presumed that Flores was using multiple couriers and sellers. Indeed, Scott's own son was recruited after Scott and Horris Carpenter were having difficulties selling the narcotics,

as was Horris Carpenter's brother. In addition, the Government introduced evidence that Scott Jr. was receiving calls from both Scott and Horris Carpenter surrounding the controlled purchase of narcotics and intercepted calls between and among many of the co-defendants. And the evidence showed that Scott was a visitor to Horris Carpenter's house, which also served as a transfer point for drugs and cash. Given that "it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise," *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir. 1993), the evidence of Scott's involvement in the conspiracy was legally sufficient.

Scott cites repeatedly to *Gibbs* in arguing there was insufficient evidence exists to show that Scott agreed to participate in the conspiracy. 182 F.3d 408. In *Gibbs*, the Government charged an amorphous group of drug dealers with conspiracy, alleging that they had conspired to control the distribution of cocaine in a local area by excluding non-local drug dealers. *Id.* This Court vacated the convictions of several of the defendants because, even though the Government proved that they had sold drugs in the area during the relevant time period, there was no proof that they agreed to participate in the charged conspiracy. *Id.* at 423. However, Scott fails to identify any aspect of the basic conspiracy charged in this case for which the jury had no basis to infer his involvement based on the evidence detailed throughout this opinion. Scott's citation to *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990), is equally unavailing because *Pearce* is distinguishable. Thus, we agree with the Government that there was sufficient evidence for the jury to conclude that Scott was part of the single, overarching conspiracy charged in the indictment. So long as the "jury's choice was a rational one," we must affirm. *United States v. Arnold*, 486 F.3d 177, 182 (6th Cir. 2007) (en banc). And so we do.[2]

---

[2] Again, Scott does not challenge his convictions for conspiracy to commit money laundering or animal fighting and we do not analyze the sufficiency of the evidence as to those Counts.

**D.**

Scott argues that statements made during the prosecutor's closing argument constituted misconduct that warrants reversal. Scott primarily contends that the prosecutor's statement regarding preventing "poison" from entering the community was an attempt to appeal to the jurors' passion or emotions such that it constitutes prejudicial misconduct. Scott also argues that the comment was exacerbated by the fact that the narcotics were in plain view during closing. We review the question of whether prosecutorial misconduct requires reversal de novo. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002).

"When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal." *United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000) (citations omitted). "To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* If the prosecutor's remarks are not flagrant, then this Court will reverse only "if proof of [the defendant's] guilt was not overwhelming, [the defendant] objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury." *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994) (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)).

First, we are not persuaded that the objected-to statement misled the jury or prejudiced the defendant. And several of our sister circuits have found that referring to narcotics as poison is within the proper bounds of closing argument. *United States v. McGill*, 815 F.3d 846, 921 (D.C. Cir. 2016) (affirming district court's denial of defendant's motion for a new trial in which

- 15 -

prosecutor referred to the "kilos and kilos of poison" defendant released onto the streets); *United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006) (allowing government's references in closing arguments to drugs as poison and defendant as a shark not plain error); *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000) (declining to vacate conviction due to closing argument in which prosecutor referred to defendant as "slick little dope dealer" who "uses kids and exploits them to peddle poison"). Second, the statement was isolated, singular, and not repeated in any form after Scott's objection. Third, it is not clear that the statement was deliberate, or even inaccurate, as it arose while the prosecutor was attempting to defend the efforts of the investigators, rather than condemn the acts of the DTO. The judge instructed the jury that closing argument is not evidence. Finally, the evidence against Scott was strong and the fact that there was ample evidence for the jury to convict Scott, even leaving aside the disputed statement, suggests that the prosecutor's remarks did not constitute plain error.

Scott also contends that the Government implicitly vouched for the credibility of the officers. This too is incorrect. Part of Scott's defense strategy was to attack the diligence of the law enforcement officers and agents involved in the investigation. In response, the Government attempted to contravene that assertion by pointing to the fruits of their labor as evidence of their efforts—chiefly, the interdiction of various drug transfers and the seizure of those narcotics. This does not constitute misconduct.

Finally, Scott's reliance on *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), is also misplaced. There, the prosecutor specifically asked that the jury send a message and "tell [the defendant] and all of the other drug dealers like her [] that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . ." *Id.* at 1148. Here, the prosecutor did not ask that the jury to send a message and was not appealing to

the jury at all. Instead, the prosecutor was describing the acts of law enforcement that had already taken place. While he described the drugs as poison, he was accurately describing facts—seizures that occurred—and did not appeal to the jury inappropriately. Because the Government's closing argument only summarized evidence presented at trial and was not calculated to inflame the jury, we will not reverse Scott's conviction based on the statements.

## E.

Lastly, Scott claims that the district court erred in calculating the quantity of cocaine that should be attributed to him pursuant to the "Relevant Conduct" provision of U.S.S.G. § 1B1.3. The court found that 16 kilograms of cocaine could be attributed to Scott. Evidence introduced directly connected Scott with quantities of at least three kilograms and substantial sums of cash. Scott's PSR stated he would be held accountable for 16 kilograms. The report detailed the Government's evidence against Scott at trial, including the statements from Wuthrich and Scott, Jr., the intercepted calls, and the pole-camera footage. The district court specifically overruled Scott's objections to the quantities of contraband attributed to him in the PSR. We accept the findings of the district court in this respect unless they are clearly erroneous and give deference to the district court's application of the guideline to the facts. *United States v. Walton*, 908 F.2d 1289, 1300-01 (6th Cir. 1990), *cert. denied*, 498 U.S. 906 (1990). The calculation of the proper drug amount attributable to Scott is a factual finding that we review for clear error. *See id.*

Scott argues that the only amount of drugs attributable to Scott should have been "no more than 2 kilograms but less than 3.5 kilograms." Setting aside the confusing structure of that sentence, and presuming that Scott argues for a sentence commensurate with between 2 and 3.5 kilograms of cocaine, this argument is without merit.

For a defendant to be held accountable for the actions of co-conspirators, "(1) the conduct must be in furtherance of the jointly undertaken criminal activity; and (2) the conduct must be reasonably foreseeable in connection with that criminal activity. *United States v. Campbell*, 279 F.3d 392, 399 (6th Cir. 2002). As the PSR detailed, there was ample evidence that 16 kilograms of cocaine was a reasonably foreseeable amount of narcotics for the members of the DTO. For example, Scott, Jr. and Wuthrich testified regarding Scott's role in the conspiracy. This alone could warrant the attribution. *See United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) ("[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable") (quotation marks omitted)). Moreover, Scott was intercepted on wiretaps, provided his son with at least three kilograms of cocaine, and joined a conspiracy whose purpose was to distribute cocaine—and from which at least 33 kilograms were seized, along with $210,000 in proceeds, which, according to Wuthrich, was personally brought to the scene by Scott. Accordingly, there was sufficient evidence adduced for the court to conclude that Scott was responsible for at least 16 kilograms of cocaine. Indeed, by varying downward from the guidelines and otherwise sentencing Scott on the basis of 16 kilograms—and not more—the district court appropriately exercised caution to ensure that Scott was "more likely than not *actually* responsible" for a quantity greater than or equal to the amount used in calculating the sentence. *See United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995) (emphasis in original).

## III.

For the foregoing reasons, we **AFFIRM** Scott's conviction and sentence.